UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PENSION TRUST FUND FOR
OPERATING ENGINEERS, et al.,

              Plaintiffs,

      v.

TRACTOR EQUIPMENT SALES, et al.,

              Defendants.

Case No. 12-cv-01056-WHO

**ORDER ON CROSS MOTIONS FOR
SUMMARY JUDGMENT[1]**

Re:  Dkt. Nos. 65, 66

## INTRODUCTION

Defendants Steven and Rena Van Tuyl ("the Van Tuyls") owned three residential properties that they leased to third parties.  The Van Tuyls also owned a controlling interest in defendant Tractor Equipment Sales, Inc. ("TES"), which participated in plaintiff Pension Trust Fund for Operating Engineers (collectively with the plaintiff trustees, the "Fund"), a multiemployer pension plan as defined under 29 U.S.C. § 1002(37)(A).  The properties and TES were in all respects unrelated except for their common ownership by the Van Tuyls.  TES withdrew from the Fund in 2010, triggering withdrawal liability pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. § 1381 *et. seq.*, that remains unpaid.  The question I must answer is whether the Fund may enforce withdrawal liability against the three rental properties because they constitute a "trade or business" under the controlled group theory as defined by 29 U.S.C. § 1301(b)(1).  Because the Van Tuyls' leasing

---

[1] This order is being issued in conjunction with another "Order on Cross Motions for Summary Judgment" in the related case, *Automotive Industries Pension Trust Fund v. Tractor Equipment Sales, Inc.*, No. 13-cv-03703-WHO (N.D. Cal. Aug. 9, 2013).  Apart from being brought by a different pension fund, that case is largely indistinguishable from this one.  Counsel is the same in both cases, the briefing is virtually identical, and the material legal and factual issues overlap completely.  The differences between the orders are accordingly minor.

United States District Court
Northern District of California

activities do not rise to the level of a trade or business within the meaning of section 1301(b)(1), the Van Tuyls' motion for summary judgment is GRANTED, and the Fund's motion against the Van Tuyls is DENIED.  In light of TES's concession that it is liable under 29 U.S.C. § 1381, the Fund's motion for summary judgment against TES is GRANTED.

**BACKGROUND**

## I.  FACTUAL BACKGROUND

The Fund provides retirement benefits for employees on whose behalf employers make contributions to the Fund.  Illacqua Decl. ¶ 3 (Dkt. No. 68).  Beginning in July 2007, TES was required to participate in the Fund pursuant to a collective bargaining agreement with a union.  *Id.* ¶¶ 4-5.  TES regularly made its required contributions until November 2010, when TES withdrew from the Fund.  *Id.* ¶ 5.  TES subsequently ceased all operations and, in May 2012, declared bankruptcy.  Van Tuyl Decl. ¶ 2 (Dkt. No. 65-1).  TES had been in the business of selling and servicing construction equipment.  *Id.* ¶ 3.

By letter dated July 29, 2011, the Fund notified TES and "all members of its controlled group" of the withdrawal liability assessed against them under ERISA's withdrawal liability provisions.  Ilacqua Decl., Ex. D.  The letter demanded payment and set forth a payment schedule.  *Id.*  On August 9, 2011, TES wrote to the Fund requesting review of its withdrawal liability but without specifying any particular issues for review.  *Id.* at Ex. E.  The Fund responded on October 21, 2011, informing TES that its withdrawal liability had been reviewed and that no changes would be made.  *Id.* at Ex. F.  No part of TES's withdrawal liability has been paid to date.  *Id.* ¶ 14.

Steven and Rena Van Tuyl are husband and wife.  Van Tuyl Decl. ¶ 2.  At all times relevant to this case, the Van Tuyls owned a controlling interest in TES.  *Id.*  The Van Tuyls also own or previously owned controlling interests in three residential properties located in different parts of California.  *Id.* ¶¶ 3-5.  A declaration submitted by Rena states the following about the properties:

In 1998, the Van Tuyls purchased a residential property in San Jose, California after a church organization reached out to them and requested that they provide a location for the

church's youth center.  Van Tuyl Decl. ¶ 3.  The property has since been used exclusively by the church as a youth center and as a residential facility for the youth center's staff.  *Id.*  The church pays "well-below-market-value" rent to the Van Tuyls for use of the property.  *Id.*  Rena states that she and her husband consider their leasing of the property to the church to be a charitable donation.  *Id.*  Rena also states that the Van Tuyls "spend virtually no time maintaining or increasing the value of the property; we merely deposit the rent we receive."  *Id.*  There is no evidence of any economic relationship between the San Jose property and TES.

In 1980, the Van Tuyls purchased a single-family residence in Merced, California.  Van Tuyl Decl. ¶ 4.  The Van Tuyls rented the property to another family from 1990 to August 2013.  *Id.*  The property is currently vacant.  *Id.*  Rena states that the Van Tuyls do not "actively take part in . . . maintaining [the] property."  *Id.*  From 2009 to 2012, the Van Tuyls "spent no time maintaining or improving the value of the property" except to deposit the rent they received and to occasionally pay a handyman to perform minor repairs.  *Id.*  Rena states that the Van Tuyls consider the property "a passive property holding for retirement purposes."  *Id.*  There is no evidence of any economic relationship between the Merced property and TES.

In 1976, the Van Tuyls purchased a single-family residence in Carnelian Bay, California, in the Lake Tahoe area.  Van Tuyl Decl. ¶ 5.  The Van Tuyls sold the property in October 2012.  *Id.*  While the Van Tuyls owned the property, they used it as a vacation home but also "at times" rented it out to friends and family.  *Id.*  Rena states that the Van Tuyls "did not actively take part in . . . maintaining the property."  *Id.*  From 2009 to 2012, the Van Tuyls "spent no time whatsoever maintaining or improving the value of the property" except to deposit the rent they received.  *Id.*  Rena also states that she and her husband considered the property "a passive property holding for vacation purposes."  *Id.*  There is no evidence of any economic relationship between the Tahoe property and TES.

The Van Tuyls' Schedule E tax returns for 2010 and 2011 show that in both years, the Van Tuyls reported substantial rents received from all three properties and claimed various deductions on account of the properties, including deductions for travel expenses, insurance, repairs, taxes, utilities, gardening, and depreciation.  *See* Bevington Decl. I, Ex. C (Dkt. No. 67-3).

United States District Court
Northern District of California

On their 2010 Schedule E tax return, the Van Tuyls reported $47,620 in rents received from the San Jose property, $10,932 in rents received from the Merced property, and $19,417 in rents received from the Tahoe property.  *Id.*  On their 2011 Schedule E tax return, the Van Tuyls reported $47,790 in rents received from the San Jose property, $11,049 in rents received from the Merced property, and $18,600 in rents received from the Tahoe property.  *Id.*  The Van Tuyls did not claim deductions for advertising in connection with any of the three properties in either year.  *Id.*

On their 2010 Schedule E tax return, in response to an item asking whether they had used each property during the tax year "for personal purposes" for more than the greater of fourteen days or ten percent of the total days the property was rented at fair rental value, the Van Tuyls answered, "No," for all three properties.  *Id.*  On their 2011 Schedule E tax return, the Van Tuyls reported 365 "fair rental days" and zero "personal use days" for all three properties.  *Id.*  The Van Tuyls admit the Schedule E tax returns are true and correct and state that they are "one hundred percent consistent" with Rena's declaration.  Van Tuyls' Reply 9-10 (Dkt. No. 74) ("The tax documents do not undermine [Rena's declaration]; rather, they corroborate and are one hundred percent consistent with it.").[2]

## II.  PROCEDURAL BACKGROUND

On July 29, 2013, the Fund filed its first amended complaint, naming TES and the Van Tuyls as defendants.  Dkt. No. 37.  The complaint asserts two causes of action: (1) withdrawal liability under 29 U.S.C. § 1381; and (2) failure to provide required information in violation of 29 U.S.C. § 1399(a).  The complaint seeks damages under 29 U.S.C. § 1132(g)(2) for (i) unpaid contributions; (ii) interest on the unpaid contributions as provided for under the plan; (iii) an amount equal to the greater of interest on the unpaid contributions or liquidated damages as

---

[2] Although TES withdrew from the fund in November 2010, I will consider the 2011 Schedule E tax return in deciding this motion because the Van Tuyls have not objected to it, and because the Van Tuyls' assertion that the tax documents are "one hundred percent" consistent with Rena's declaration indicates these documents cast light on the Van Tuyls' use of the properties during the period of TES's participation in the Fund.

United States District Court
Northern District of California

provided for under the plan; and (iv) reasonable attorney fees and costs. *Id.* at 10. The complaint also requests injunctive relief in the form of an order requiring defendants "to provide documentation of all trades or business . . . within [d]efendants' controlled group as defined in . . . 29 U.S.C. § 1301(b)(1)." *Id.* According to the Fund's summary judgment motion, damages currently amount to more than $300,000. Fund's Mot. 2 (Dkt. No. 66).

On July 30, 2014, TES and the Van Tuyls moved for summary judgment on both causes of action. Van Tuyls' Mot. (Dkt. No. 65). The Fund moved for summary judgment on the same date. Dkt. No. 66. During the hearing on September 3, 2014, both parties conceded that there are no material facts other than those already disclosed in the papers, and that the record is sufficiently developed to decide this case as a matter of law.

## LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if it could reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material where it could affect the outcome of the case. *Id.*

The party moving for summary judgment has the initial burden of demonstrating the absence of a genuine issue of material fact as to an essential element of the nonmoving party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986). Once the movant has made this showing, the burden shifts to the nonmoving party to identify specific evidence showing there is a genuine issue of material fact for trial. *Id.* If the nonmoving party cannot do so, the movant "is entitled to . . . judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Id.* (internal quotation marks omitted).

On summary judgment, the court draws all reasonable factual inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact

1  and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594

2  F.2d 730, 738-39 (9th Cir. 1979).

3      Where the determination of whether an activity constitutes a trade or business under 29

4  U.S.C. § 1301(b)(1) is ultimately a question of the characterization of a group of undisputed facts,

5  it is properly resolved by summary judgment. *Cent. States, Se. & Sw. Areas Pension Fund v.*

6  *Slotky*, 956 F.2d 1369, 1373-74 (7th Cir. 1992); *Cent. States, Se. & Sw. Areas Pension Fund v.*

7  *Miller*, 868 F. Supp. 995, 1001 (N.D. Ill. 1994).

8                                          **DISCUSSION**

9      Pension plans like the Fund in this case are federally regulated under ERISA, 29 U.S.C. §

10  1001 *et seq.* The MPPAA, 29 U.S.C. § 1381 *et seq.*, amended ERISA to allow pension plans "to

11  impose proportional liability on withdrawing employers for the unfunded vested benefit

12  obligations of multiemployer plans." *Carpenters Pension Trust Fund for N. California v.*

13  *Underground Const. Co., Inc.*, 31 F.3d 776, 778 (9th Cir. 1994). Where a withdrawing

14  employer's past contributions are insufficient to fund pension plan obligations that have already

15  vested at the time of withdrawal, the MPPAA amendments enable plans "to make withdrawing

16  employers pay their proportionate share of the deficit such that remaining employers [will] not be

17  unfairly saddled with increased payments." *Id.*

18      This "withdrawal liability" is assessed against the withdrawing employer, and 29 U.S.C. §

19  1301(b)(1) defines "employer" to include not only the entity obligated to contribute to the pension

20  plan, but also all "trades or businesses" that are under "common control" with that entity. *See* 29

21  U.S.C. § 1301(b)(1). Congress enacted section 1301(b)(1) "to prevent businesses from shirking

22  their ERISA obligations by fractionalizing operations into many separate entities." *Teamsters*

23  *Pension Trust Fund-Bd. of Trustees of W. Conference v. Allyn Transp. Co.*, 832 F.2d 502, 507 (9th

24  Cir. 1987); *see also, Bd. of Trustees of W. Conference of Teamsters Pension Trust Fund v.*

25  *Lafrenz*, 837 F.2d 892, 894 (9th Cir. 1988) ("The point of section 1301(b)(1) is simply to prevent

26  the controlling group . . . from avoiding withdrawal liability by shifting corporate assets into other

27  business ventures under its control."). Under the section 1301(b)(1) framework, withdrawal

28  liability may be imposed against an entity other than the one obligated to contribute to the pension

6

United States District Court
Northern District of California

plan so long as: (1) the entity is under "common control" with the withdrawing entity; and (2) the entity is a "trade or business." *See* 29 U.S.C. § 1301(b)(1); *Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson,* 238 F.3d 891, 894-95 (7th Cir. 2001) ("[T]o impose withdrawal liability on an organization other than the one obligated to [contribute], two conditions must be satisfied: (1) the organization must be under common control with the obligated corporation; and (2) it must be a trade or business.").  Where these two elements are satisfied, all entities within the controlled group are jointly and severally liable for each other's withdrawal liability.  *Lafrenz*, 837 F.2d at 893.

There is no dispute in this case over whether withdrawal liability may be assessed against the withdrawing employer, TES; the parties agree that TES is liable to the Fund under 29 U.S.C. § 1381.  Van Tuyls' Mot. 6; Fund's Reply 3 (Dkt. No. 73).  The dispute is whether the Van Tuyls also may be held liable for TES's withdrawal liability based on the Van Tuyls' leasing activities in connection with their three properties.

The Fund asserts that summary judgment in their favor is appropriate because the Van Tuyls commonly controlled TES and the three properties, and the Van Tuyls' leasing activities constitute a trade or business for the purposes of section 1301(b)(1).  The Van Tuyls concede that section 1301(b)(1)'s common control element is satisfied but assert that their leasing of the properties cannot be properly characterized as a trade or business.  Van Tuyls' Mot. 6.  On this ground, the Van Tuyls oppose the Fund's motion for summary judgment and, in addition, move for summary judgment themselves.  The upshot is that both summary judgment motions at issue in this order boil down to a single question: whether the Van Tuyls' leasing of the San Jose, Merced, and Tahoe properties qualifies as a trade or business under section 1301(b)(1).

## I.  EVIDENTIARY AND PROCEDURAL ISSUES

The Fund raises three initial matters.  The Fund makes relevance objections against certain items of evidence submitted by the Van Tuyls and argues the same items should also be excluded under Federal Rule of Civil Procedure 37(c)(1) because the Van Tuyls did not timely disclose them.  Fund's Opp. 3-4 (Dkt. No. 71).  In addition, the Fund asserts the Van Tuyls waived their right to challenge withdrawal liability because they failed to comply with ERISA's arbitration

1    requirement.  Fund's Mot. 8-9.

2        **A.  Relevance Objections**

3        The Fund argues that certain statements and two documents submitted by the Van Tuyls

4    concerning their use of the properties are inadmissible as irrelevant under Federal Rule of

5    Evidence 401.  Fund's Opp. 3-4.  The contested statements are those in which Rena describes the

6    church's use of the San Jose property as a youth center and the Van Tuyls' minimal involvement

7    with the San Jose, Merced, and Tahoe properties.  *Id.*  One of the contested documents is an email,

8    written by a member of the church using the San Jose property as a youth center, which explains

9    the circumstances surrounding the Van Tuyls' purchase of the property at the church's behest.

10   Van Tuyl Decl., Ex. A.  The email is dated August 1, 2013.  *Id.*  The other contested document is a

11   letter from another member of the church describing the youth center's activities.  *Id.* at Ex. B.

12   The letter is dated January 25, 2014.  *Id.*  The Fund argues this evidence is relevant only insofar as

13   it supports the Van Tuyls' contention that their use of their properties does not constitute a trade or

14   business under *Comm'r v. Groetzinger*, 480 U.S. 23 (1987).  Because the *Groetzinger* test does

15   not apply in the Ninth Circuit to determine whether an activity qualifies as a trade or business

16   under section 1301(b)(1), the Fund argues, the evidence is irrelevant.  Fund's Opp. 3-4.

17       As discussed in more detail below, I agree with the Fund that *Groetzinger* does not govern

18   section 1301(b)(1) trade or business determinations within the Ninth Circuit.  This does not mean,

19   however, that the contested evidence is irrelevant.  Under Ninth Circuit precedent, section

20   1301(b)(1) "trade or business" determinations are made by a fact-intensive inquiry into the activity

21   at issue.  *See Lafrenz*, 837 F.2d at 894 n.6.  Evidence concerning the Van Tuyls' use of their

22   properties, and their purpose in owning and leasing them, is relevant in this inquiry.  *See* Fed. R.

23   Evid. 401.  The Fund's relevance objection is OVERRULED.

24       The Fund makes two additional relevance objections.  One is against statements in Rena's

25   declaration concerning TES's manager at the time the business ceased operations. Fund's Opp. 3-

26   4.  The other is against unsupported factual assertions in the Van Tuyls' motion concerning the

27   current funding level of the Fund.  *Id.*  These objections are SUSTAINED.  I will not consider this

28   evidence in deciding these motions.

United States District Court
Northern District of California

**B.  Failure to Disclose**

The Fund also argues that the same statements and documents concerning the Van Tuyls' use of their properties should be excluded under Federal Rule of Civil Procedure 37(c)(1).  Fund's Opp. 3-4.  Rule 37(c)(1) provides that a party who "fails to provide information . . . as required by Rule 26(a) or (e) . . . is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Rule 26(a) requires each party, "without awaiting a discovery request," to identify "each individual likely to have discoverable information" and "all documents, electronically stored information, and tangible things" that the "disclosing party may use to support its claims or defenses."  Fed. R. Civ. P. 26(a)(1)(A).  Rule 26(e) creates an obligation to supplement all Rule 26(a) disclosures.  Fed. R. Civ. P. 26(e)(1).  Supplemental disclosures must be made "in a timely manner" when a "party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  *Id.*

Under Rule 37(c)(1), the party whose evidence may be excluded has the burden of proving that its failure to disclose was substantially justified or is harmless.  *R & R Sails, Inc. v. Ins. Co. of Pennsylvania*, 673 F.3d 1240, 1246 (9th Cir. 2012).  "The determination of whether a failure to disclose is justified or harmless is entrusted to the broad discretion of the district court."  *San Francisco Bay Area Rapid Transit Dist. v. Spencer*, No. 04-04632-SI, 2007 WL 421336, at *4 (N.D. Cal. Feb. 5, 2007).  Nondisclosure is harmless if it does not prejudice the other party.  *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  In assessing harmlessness, I may consider a number of factors, including "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence."  *Unionamerica Ins. Co., Ltd. v. Fort Miller Grp., Inc.*, No. 05-01912-BZ, 2009 WL 275104, at *1 (N.D. Cal. Feb. 4, 2009).

The Fund argues the Van Tuyls were required to disclose the statements and documents

9

1   concerning their use of the properties either as part of their Rule 26(a) initial disclosures or in

2   response to the Fund's interrogatories requesting "all facts" and "all documents that evidence,

3   refer, or relate to any . . . facts" on which the Van Tuyls base their contention that they and TES

4   are not part of a controlled group.  Fund's Opp. 3-4.  The Van Tuyls responded to these

5   interrogatories by informing the Fund that they "do not own any other trades or businesses" and

6   "are not involved with any property other than [TES] with any measure of continuity or regularity

7   . . . sufficient to invoke the controlled group theory doctrine."  *See* Bevington Decl. I, Exs. H, I.

8   However, the Van Tuyls did not provide any more specific information concerning their use of the

9   properties.  *See id.*  Nor did the Van Tuyls provide the email and letter they now submit as

10  evidence of the church's use of the San Jose property as a youth center.  *See* Bevington Decl. II ¶

11  12 (Dkt. No. 72).  The Fund argues this nondisclosure "is not harmless because it prevented [the

12  Fund] from ascertaining the facts and documents on which [the Van Tuyls] would rely for a

13  dispositive motion . . . and from conducting further discovery concerning these facts and

14  documents."  Fund's Opp. 4.

15         The Van Tuyls assert that their response to the interrogatories was sufficient, and that they

16  were "substantially justified in any supposed 'failure to disclose' every fact related in any way to

17  every property they own," in particular after having properly objected to the Fund's interrogatories

18  as "vague, ambiguous, overbroad, and unduly burdensome."  Van Tuyls' Reply 4-6.  The Van

19  Tuyls further argue that any failure to disclose was harmless.  *Id.* at 5-6.  The Van Tuyls submit a

20  letter, dated June 11, 2013 and addressed to the Fund's counsel, in which counsel for the Van

21  Tuyls writes that the San Jose property is dedicated to "nonprofit church use.  [The Van Tuyls] are

22  not involved with the property with any measure of business continuity or regularity and they do

23  not maintain it for the purpose of creating income or profit."  Boggs Decl., Ex. A (Dkt. No. 74-1).

24  Although the letter speaks only to the San Jose property, the Van Tuyls contend it shows that the

25  Fund was not prejudiced by the Van Tuyls' failure to provide more detailed information during

26  discovery about their use of any of the three residential properties.  Van Tuyls' Reply 5-6.[3]

27

28  _____
[3] The Van Tuyls also contend their failure to disclose was harmless because of information shared
between the parties during a court-ordered mediation session on February 7, 2014.  Van Tuyls'

United States District Court
Northern District of California

As to the contested email and letter, attached as exhibits A and B to Rena's declaration, Rules 26(a) and (e) plainly required the Van Tuyls to disclose these documents and their authors prior to filing the instant summary judgment motion. The Van Tuyls have not satisfied their burden of showing the nondisclosure was either substantially justified or harmless. I will not consider the email or letter in resolving the instant motions.

As to the contested statements in Rena's declaration, I conclude that any failure to disclose, assuming one occurred, is harmless. The contested statements all concern the Van Tuyls' use of the three properties. The Fund knew the Van Tuyls owned these properties; indeed, the Fund had been given tax documents which included substantial information about the Van Tuyls' use of each of the properties. *See* Fund's Opp. 4-5; Bevington Decl. I, Ex. C. The Fund had also been sent a letter stating that the San Jose property is dedicated to "nonprofit church use" and that the Van Tuyls "are not involved with the property with any measure of business continuity or regularity and they do not maintain it for the purpose of creating income or profit." Boggs Decl., Ex. A. Had the Fund decided to inquire more into the Van Tuyls' use of the properties, the Fund easily could have done so, for example, by propounding targeted interrogatories or by deposing either (or both) of the Van Tuyls. Instead, the Fund cancelled its scheduled depositions of Steven and Rena Van Tuyl the night before they were set to occur. Boggs Decl. ¶ 4. The Fund cannot say now it was surprised to learn additional details about the Van Tuyls' use of their properties. Any failure by the Van Tuyls to disclose the contested statements is harmless within the meaning of Rule 37(c)(1), and I will consider the statements in deciding the instant motions.

**C. ERISA's Arbitration Requirement**

The Fund asserts the Van Tuyls failed to follow the proper procedures for challenging their withdrawal liability, thereby waiving their right to do so now. Fund's Mot. 8-9. Under 29 U.S.C.

---

Reply 5-6; Boggs Decl. ¶ 3. The Fund responds that under ADR Local Rule 6-12(a), "anything that happened or was said . . . in connection with any mediation" cannot be disclosed by the parties or "[u]sed for any purpose . . . in any pending or future proceeding in this court." Fund's Mot. to Strike 1 (Dkt. No. 75); ADR L.R. 6-12(a). On this ground, the Fund moves to strike all references to events occurring during the February 7, 2014 mediation session contained in the Van Tuyls' reply brief and attached declaration. Fund's Mot. to Strike 1-2. The Fund's motion to strike is GRANTED. I will disregard all references to events occurring during the February 7, 2014 mediation session contained in the Van Tuyls' reply brief and attached declaration.

§ 1401(a)(1), "[a]ny dispute over withdrawal liability as determined under the enumerated statutory provisions shall be arbitrated." *Allyn Transp. Co.*, 832 F.2d at 504. "If an employer fails to initiate arbitration, the employer waives the opportunity to assert any defenses that could have been raised before the arbitrator." *Pension Plan for Pension Trust Fund for Operating Engineers v. Galletti Concrete, Inc.*, No. 13-cv-03176-SI, 2013 WL 5289017, at *2 (N.D. Cal. Sept. 19, 2013).

To comply with ERISA's arbitration requirement, the Van Tuyls were required to do two things: first, timely and properly request review; and second, timely and properly initiate arbitration. *See* 29 U.S.C. §§ 1399(b)(2)(A), 1401(a)(1); *Pension Plan for Pension Trust Fund for Operating Engineers v. Weldway Const., Inc.*, 920 F. Supp. 2d 1034, 1044 (N.D. Cal. 2013). The Fund is correct that the Van Tuyls failed to comply with these requirements. Although the Van Tuyls timely requested review of the withdrawal liability assessed against them, they failed to identify a "specific matter" for review, as required by 29 U.S.C. § 1399(b)(2)(A). *See* Ilacqua Decl., Ex. E. There is also no indication in the record that the Van Tuyls made any attempt whatsoever to initiate arbitration.

Nevertheless, the Van Tuyls have not waived their right to contest the issue of controlled group liability. As noted above, under 29 U.S.C. § 1401(a)(1), "[a]ny dispute over withdrawal liability as determined under the enumerated statutory provisions shall be arbitrated." *Allyn Transp. Co.*, 832 F.2d at 504. But the only "enumerated statutory provisions" in section 1401(a)(1) are sections 1381 through 1399. *See* 29 U.S.C. § 1401(a)(1) ("Any dispute between an employer and the plan sponsor of a multiemployer plan *concerning a determination made under sections 1381 through 1399 of this title* shall be resolved through arbitration.") (emphasis added). Controlled group liability, on the other hand, is governed by section 1301(b)(1). *See Lafrenz*, 837 F.2d at 893-95. Moreover, while the Ninth Circuit has not yet directly addressed the issue, several other circuit courts have held that the issue of whether a defendant is an employer within the meaning of section 1301(b)(1) is a matter for the court to decide, not the arbitrator. *See Galletti*, 2013 WL 5289017, at *2 (listing cases from the Second, Third, Fourth, Eighth, and Eleventh Circuits). The Van Tuyls' failure to arbitrate does not preclude them from challenging their

1   alleged controlled group liability here.

2   **II.  "TRADE OR BUSINESS" UNDER 29 U.S.C. § 1301(b)(1)**

3         ERISA does not define the term "trade or business."  *See Lafrenz*, 837 F.2d at 894 n.6.

4   Section 1301(b)(1) provides that the phrase "trades or businesses (whether or not incorporated)

5   which are under common control" has the same meaning as that provided in the regulations

6   promulgated under section 414(c) of the Internal Revenue Code.  29 U.S.C. § 1301(b)(1).  But

7   "trade or business" is not defined in either section 414(c) or the regulations promulgated

8   thereunder.  *See Lafrenz*, 837 F.2d at 894 n.6 (observing same).  The Ninth Circuit has also

9   provided little guidance as to what constitutes a "trade or business" under section 1301(b)(1)

10  except to note that it is an "essentially factual inquiry."  *Id.*  In the absence of clear authority, the

11  parties offer different tests for determining whether the Van Tuyls' leasing activities qualify as a

12  trade or business.

13        The Van Tuyls argue I should apply the test from *Groetzinger*.  Van Tuyls' Mot. 7-10.  In

14  *Groetzinger*, the Supreme Court interpreted Internal Revenue Code sections 62(1) and 162(a) and

15  held that for an activity to be a "trade or business" under those provisions, the activity must be

16  performed (i) for the primary purpose of income or profit, and (ii) with continuity and regularity.

17  480 U.S. at 35.  The Court distinguished between "a sporadic activity, a hobby, or an amusement

18  diversion," on the one hand, and a trade or business, on the other.  *Id.*  The Seventh Circuit has

19  adopted the *Groetzinger* test for determining whether an activity is a trade or business under

20  section 1301(b)(1), reasoning that "while *Groetzinger* was interpreting only a specific provision in

21  the tax code, its test comports with the common meaning of trade or business and thus can be used

22  more generally."  *Fulkerson*, 238 F.3d at 895.  The D.C. Circuit has also applied the *Groetzinger*

23  test in the section 1301(b)(1) context.  *See Connors v. Incoal, Inc.*, 995 F.2d 245, 251 (D.C. Cir.

24  1993) ("[T]he [Supreme Court's] construction of 'trade or business' is the most authoritative

25  pronouncement available, and we therefore rely on it.").

26        There is little question that, if I were to apply *Groetzinger* to the instant case, the Van

27  Tuyls would be entitled to summary judgment.  Applying *Groetzinger*, the Seventh Circuit has

28  rejected controlled group liability in circumstances similar to the ones at issue here on at least two

United States District Court
Northern District of California

occasions. *See Fulkerson*, 238 F.3d at 893-96; *Cent. States, Se. & Sw. Areas Pension Fund v. White,* 258 F.3d 636, 643-44 (7th Cir. 2001).

In *Fulkerson*, the defendant owners of the withdrawing employer, a trucking business called Holmes Freight Lines, Inc., were husband and wife Tom and Dolly Fulkerson. 238 F.3d at 893. In addition to managing Holmes Freight Lines, Inc., Tom leased three properties to another trucking business, Action Express, Inc. *Id.* Although Action Express, Inc. was owned by the Fulkersons' sons, the Fulkersons had no ownership interest in the business and did not participate in its management. *Id.* The leases were "triple net leases, under which the tenant is responsible for most obligations such as maintenance, operating expenses, real estate taxes, and insurance." *Id.* Tom did not "devot[e] more than five hours in any year in connection with the properties" and "claim[ed] that he purchased the properties for investment purposes." *Id.* "According to Tom, he [did] little more than deposit the rent checks and make mortgage payments, and repor[t] the rental income on Schedule E" of his federal tax returns. *Id.* The district court granted summary judgment for the plaintiff pension fund and ordered the Fulkersons to pay the balance of Holmes Freight Lines, Inc.'s withdrawal liability. *Id.* at 894.

The Seventh Circuit reversed, holding that the facts concerning Tom's leasing activities were not sufficient to satisfy the "continuous and regular" prong of the *Groetzinger* test, at least not as a matter of law. *Id.* at 895-97. Noting that "one purpose of the *Groetzinger* test is to distinguish trades or business from investments," the court held that the mere ownership of a property "is the hallmark of an investment" and thus "cannot be considered in determining whether conduct is regular or continuous." *Id.* at 895-96. The court concluded that, once Tom's mere ownership of the leases was "removed from the equation, a reasonable factfinder could determine that the leasing activities were not sufficiently continuous and regular to constitute a trade or business." *Id.* at 896. In reaching this conclusion, the court emphasized that "the leases were an investment that rarely required the time or attention of the Fulkersons," and that Tom "never spent more than five hours in a year dealing with the leases or the leased properties." *Id.* The court also observed that "[g]iven the prevalence of investing, permitting the holding of investments . . . without more to be considered regular and continuous activity would eviscerate

14

1    the limitations placed in the text of section 1301(b)(1)." *Id.* at 896.

2        The Seventh Circuit again considered whether a husband and wife's property leasing

3    constituted a trade or business under section 1301(b)(1) in *White*. *See* 258 F.3d at 639-45. The

4    properties in question were two apartments located over the garage of the Whites' home which the

5    Whites rented primarily to students at a nearby university. *Id.* at 638. The district court found that

6    the Whites leasing of the garage apartments was sufficient to impose controlled group liability and

7    granted summary judgment for the plaintiff pension fund. *Id.* at 639.

8        As in *Fulkerson*, the Seventh Circuit reversed, holding that the Whites' leasing activities

9    were "more akin to a purely personal investment" and thus were "not sufficiently continuous or

10   regular to constitute a trade or business." *Id.* at 643. The court recognized that the Whites spent

11   more time maintaining their leased properties than did the defendants in *Fulkerson* but found that

12   this was legally insignificant given that the Whites' activities "did not benefit a trade or business

13   that could be easily separated from the normal maintenance and upkeep that every homeowner

14   performs. The Whites' activities, however extensive, in the upkeep and maintenance of their

15   investment in their primary residence were personal in nature, and as such, do not rise to the level

16   of a trade or business." *Id.* at 643-644. The court disregarded evidence that the Whites obtained

17   tax benefits from leasing the properties in the form of deductions and depreciation, finding that

18   "the same such arguments could be made about any other traditional investment activity." *Id.* at

19   644. Finally, the court emphasized that section 1301(b)(1)'s purpose is to "prevent businesses

20   from shirking their ERISA obligations by fractionalizing operations into many separate entities,"

21   and that the Whites' leasing activities had "absolutely no possibility of being used to dissipate or

22   fractionalize [the withdrawing employer's] assets." *Id.* The court remanded the case to the district

23   court with instructions to enter summary judgment for the Whites. *Id.* at 645.

24       *Fulkerson* and *White* indicate that, under the *Groetzinger* test, the Van Tuyls' leasing

25   activities do not rise to the level of a trade or business. Like the defendants in those cases, the Van

26   Tuyls have presented evidence showing that the properties they leased were not economically

27   related to the withdrawing employer, and that the Van Tuyls spent minimal time managing or

28   maintaining the properties except to deposit the rent they received. *See* Van Tuyl Decl. ¶¶ 3-5.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Fund has not presented evidence indicating otherwise.  The Fund merely points to the Van

2    Tuyls' Schedule E tax returns, but the tax returns neither contradict Rena's testimony nor provide

3    a basis from which a factfinder could reasonably conclude, under the *Groetzinger* test, that the

4    Van Tuyls' leasing activities constitute a trade or business.  *See* Fund's Opp. 5, 10; Bevington

5    Decl. I, Ex. C.  The tax returns indicate that the Van Tuyls generally leased the properties instead

6    of retaining them for personal use, but this is clearly not enough to trigger controlled group

7    liability, as both the Fulkersons and the Whites leased their properties continuously.  The tax

8    returns also demonstrate that the Van Tuyls reported rental income and claimed deductions based

9    on the properties, but this is also insufficient, as "the same such arguments could be made about

10   any other traditional investment activity."  *White*, 258 F.3d at 644.  Given the factual similarities

11   between this case and *Fulkerson* and *White*, the absence of disputed facts in the record, and the

12   concession from both parties at the September 3, 2014 hearing that no additional evidence is

13   necessary to properly resolve their motions, the Van Tuyls would be entitled to summary

14   judgment under the *Groetzinger* test.

15        The Fund does not seriously dispute this conclusion.  Instead, the Fund contends that the

16   *Groetzinger* test does not apply in the Ninth Circuit.  On this point, the Fund appears to be correct.

17   Although the Van Tuyls cite to a number of cases applying the *Groetzinger* test to assess

18   controlled group liability under section 1301(b)(1), none are from the Ninth Circuit or any district

19   within it.  *See* Van Tuyls' Mot. 7-8; Van Tuyls' Reply 8-9.  In *Lafrenz* – which was decided nearly

20   one year after *Groetzinger* and which continues be the only published decision by the Ninth

21   Circuit squarely addressing the proper definition of trade or business under section 1301(b)(1) –

22   the court conducted a trade or business analysis without referring once to *Groetzinger*.  *See* 837

23   F.2d at 893-95.  With one exception, recent cases in this district have either explicitly declined to

24   apply *Groetzinger* in making section 1301(b)(1) determinations, or, like *Lafrenz*, have made them

25   without reference to *Groetzinger*.  *See Galletti Concrete,* 2013 WL 5289017, at *3 n.4 (declining

26   to apply *Groetzinger* to determine whether defendants were section 1301(b)(1) trades or

27   businesses); *Carpenters Pension Trust Fund for N. California v. Lindquist*, No. 10-03386-SC,

28   2011 WL 2884850, at *4 n.7 (N.D. Cal. July 19, 2011), *aff'd*, 491 F. Appx. 830 (9th Cir. 2012)

United States District Court
Northern District of California

1   ("[T]he Ninth Circuit has not adopted [the *Groetzinger* test], and the Court declines to do so

2   here."); *Pac. Coast Shipyards Pension Fund v. Nautical Eng'g, Inc.*, No. 12-05439-RS, 2014 WL

3   120637, at *3 (N.D. Cal. Jan. 13, 2014) (dismissing controlled group liability claim without

4   reference to *Groetzinger*); *but see, Bakery & Confectionery Union & Indus. Int'l Pension Fund v.*

5   *Wilson*, No. 09-cv-00256-JF, 2009 WL 1357409, at *2 (N.D. Cal. May 13, 2009) (relying on

6   *Groetzinger* in determining whether defendants' activities constituted a section 1301(b)(1) trade or

7   business).  Moreover, the Supreme Court in *Groetzinger* cautioned that its "interpretation of the

8   phrase 'trade or business' is confined to the specific sections of the [Internal Revenue] Code at

9   issue here. We do not purport to construe the phrase where it appears in other places." 480 U.S. at

10  27 n.8; *see also, Carpenters Pension Trust Fund for N. California v. Lindquist*, 491 F. Appx. 830,

11  831 (9th Cir. 2012) (rejecting argument that district court erred by not applying *Groetzinger* to

12  define trade or business under section 1301(b)(1); noting that *Groetzinger* "confin[ed] its statutory

13  construction of the phrase 'trade or business' to the tax code provision at issue").

14         While I agree with the Fund that *Lafrenz*, as opposed to *Groetzinger*, must guide my

15  inquiry, I disagree that this makes any difference in the outcome in this case.  Even under *Lafrenz*,

16  the Van Tuyls' leasing activities do not rise to the level of a trade or business within the meaning

17  of section 1301(b)(1).

18         In addition to owning the withdrawing employer, the defendants in *Lafrenz* owned two

19  trucks, which they leased back to the withdrawing employer for profit.  837 F.2d at 893.  The

20  district court granted summary judgment for the plaintiff pension fund on the ground that the

21  defendants' truck-leasing constituted a commonly-controlled trade or business under section

22  1301(b)(1).  *Id.*  The defendants argued on appeal that their truck-leasing was not a trade or

23  business because it was a "passive investment."  *Id.* at 893-95.  The Ninth Circuit disagreed.  *Id.*

24  The court approvingly cited two district court cases holding that a commonly controlled entity

25  which leases property to another entity within the same controlled group qualifies as a trade or

26  business under section 1301(b)(1).  *Id.* at 894 (citing *United Food v. Progressive Supermarkets*,

27  644 F. Supp. 633 (D.N.J. 1986); *Pension Benefit Guaranty Corp. v. Cent. City Motors*, 609 F.

28  Supp. 409 (S.D. Cal. 1984)).  The court reasoned:  "The [defendants] own the trucks, arranged for

United States District Court
Northern District of California

the truck leases and admittedly leased the trucks for profit.  That is plainly sufficient to make the truck-leasing operation a trade or business."  *Id.* (internal quotation marks omitted).  The court was careful to clarify that not every "passive investment" is necessarily a trade or business, however.  *Id.* at 894 n.7.  The court described the section 1301(b)(1) analysis as "an essentially factual inquiry" and narrowly held that "the facts in this case justify the conclusion that the truck-leasing operation is a trade or business" within the meaning of the statute.  *Id.* at 894 n.6, n.7 (internal quotation marks omitted).

The district court in *Lindquist* considered similar facts and reached the same result.  *See* 2011 WL 2884850, at *4-7.  There, in addition to the withdrawing employer, the defendant owned a commercial property, which he leased back to the withdrawing employer.  *Id.* at *4.  The defendant argued "his involvement with the [commercial property] was so minimal as to render [it] a passive investment rather than a trade or business."  *Id.* at *4 (internal quotation marks omitted).  The district court rejected this argument, concluding that "there is simply no significant basis for distinguishing this case from *Lafrenz* or a multitude of other cases that have uniformly found property leases between two commonly controlled entities to constitute a trade or business under section 1301(b)(1)."  *Id.* at *5 (citing cases).  The district court emphasized that the defendant's "leasing operation poses precisely the type of fractionalization threat that section 1301(b)(1) was designed to address."  *Id.* at *7.

*Lafrenz* and *Lindquist* provide a basic framework for making section 1301(b)(1) determinations within the Ninth Circuit:  It is an "essentially factual inquiry."  *Lafrenz*, 837 F.2d at 894 n.6.  In making this inquiry, "courts look to Congress's purpose in enacting section 1301(b)(1): 'to prevent the controlling group . . . from avoiding withdrawal liability by shifting corporate assets into other business ventures under its control.' "  *Lindquist*, 2011 WL 2884850, at *4 (citing *Lafrenz*, 837 F.2d at 894).  "[P]roperty leases between two commonly-controlled entities . . . constitute a trade or business."  *Id.* at *6.  But "the mere ownership" of property, without more, is insufficient to trigger controlled group liability under section 1301(b).  *Nautical Eng'g*, 2014 WL 120637, at *3; *Galletti Concrete,* 2013 WL 5289017, at *4.

Applying this framework to the instant case, a factfinder could not reasonably conclude

18

1   that the Van Tuyls' leasing activities rise to the level of a trade or business under section

2   1301(b)(1).  The Van Tuyls have presented evidence showing that throughout the period of TES's

3   participation in the Fund, both the San Jose property and the Merced property were leased to a

4   single, continuous tenant, while the Tahoe property was either used as the Van Tuyls' own

5   vacation home or was leased to friends and family.  Van Tuyl Decl. ¶¶ 3-5.  The evidence also

6   shows that the Van Tuyls spent minimal time maintaining or managing the properties except to

7   deposit the rent they received, and that the Van Tuyls considered the Tahoe and Merced properties

8   to be "passive property holdings" and their leasing of the San Jose property to be a charitable

9   donation.  *Id.*  There is no evidence of any economic relationship whatsoever between any of the

10  three properties and TES.  These facts do not go far enough beyond "the mere ownership" of

11  property to present the sort of "fractionalization threat that section 1301(b)(1) was designed to

12  address" and to trigger controlled group liability under the statute.  *Lindquist*, 2011 WL 2884850,

13  at *7; *Galletti Concrete,* 2013 WL 5289017, at *4.

14         The Fund has not submitted evidence indicating otherwise.  There is no evidence that the

15  Van Tuyls' leasing activities were performed in the name of a formally recognized business

16  organization.  *Fulkerson*, 238 F.3d at 895 (noting that section 1301(b)(1) "presents no interpretive

17  difficulties when it is used to impute withdrawal liability to another corporation or other formally

18  recognized business organization").  There is no evidence that the Van Tuyls conducted frequent

19  real estate transactions or engaged in any advertising of their properties.  *See Cent. States, Se. &*

20  *Sw. Pension Fund v. Pers., Inc.*, 974 F.2d 789, 794-96 (7th Cir. 1992) (holding that defendant's

21  real estate activities constituted a trade or business under section 1301(b)(1) where defendant

22  bought, sold and leased multiple properties annually during the relevant time period and claimed

23  advertising deductions for several of the properties).  Nor is there evidence that the minimal

24  amount of time the Van Tuyls claim to have spent in managing and maintaining the properties is

25  inaccurate, or that the Van Tuyls in fact considered their leasing activities to be a trade or

26  business.  *Cent. States, Se. & Sw. Areas Pension Fund v. Pioneer Ranch Ltd. P'ship*, No. 05-cv-

27  05908, 2006 WL 2054385, at *4 (N.D. Ill. July 20, 2006), *aff'd sub nom., McDougall v. Pioneer*

28  *Ranch Ltd. P'ship*, 494 F.3d 571 (7th Cir. 2007) (holding that defendant's ranch was a trade or

United States District Court
Northern District of California

19

United States District Court
Northern District of California

1    business, despite defendant's claim that it was merely an "estate planning device," where the ranch

2    was formed as a limited partnership, the ranch employed one long-term and several short-term

3    employees, and the ranch's partnership agreement stated that its purpose was to "acquir[e] real and

4    personal property to be used in . . . the business of . . . ranching").

5         The only evidence the Fund presents in support of its assertion that the Van Tuyls' leasing

6    activities constitute a trade or business is the Schedule E tax returns.  But the tax returns merely

7    show that the Van Tuyls received rental income from the properties, claimed certain deductions on

8    account of the properties, and generally leased the properties instead of retaining them for personal

9    use.  *See* Bevington Decl. I, Ex. C.  As the Van Tuyls state in their papers, this information is not

10   inconsistent with Rena's declaration.  *See* Van Tuyls' Reply 9-10.  It is also unclear how this

11   information, without more, is enough to transform the Van Tuyls' leasing activities from an

12   investment into a trade or business.  Standing against Rena's sworn declaration, and the utter lack

13   of other evidence presented by the Fund, the Schedule E tax returns are not sufficient to create a

14   triable issue on whether the leasing of the properties may be reasonably characterized as a trade or

15   business under section 1301(b)(1).

16        It is true that the leasing activities at issue in *Lafrenz* and *Lindquist*, like the leasing

17   activities at issue here, were relatively insubstantial.  The defendants in *Lafrenz* leased only two

18   trucks, while the defendant in *Lindquist* leased a single commercial property and testified that he

19   "spent less than [five] hours per year" dealing with it.  *Lindquist*, 2011 WL 2884850, at *5.  The

20   crucial difference between those cases and this one, however, is that there is no evidence here of

21   any economic relationship between the leased properties and the withdrawing employer, TES.

22   The Van Tuyls' leasing activities are thus beyond the scope of what has become a categorical rule

23   that "property leases between two commonly-controlled entities . . . constitute a trade or business

24   under section 1301(b)(1)."  *Lindquist*, 2011 WL 2884850, at *6; *see also, Cent. States Se. & Sw.*

25   *Areas Pension Fund v. Messina Products, LLC*, 706 F.3d 874, 881-83 (7th Cir. 2013) ("leasing

26   property to a withdrawing employer itself is categorically a trade or business") (internal quotation

27   marks omitted); *Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 879

28   (7th Cir. 2011) (same); *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Delaware*

20

United States District Court
Northern District of California

1  *Valley Sign Corp.*, 945 F. Supp. 2d 649, 653 (E.D. Va. 2013) ("Although the Fourth Circuit has

2  not yet addressed this issue, those circuit and district courts that have done so are in accord that

3  renting property to a withdrawing employer is categorically a trade or business.") (internal

4  quotation marks and modifications omitted) (listing cases); *Trustees of Amalgamated Ins. Fund v.*

5  *Saltz*, 760 F. Supp. 55, 57 (S.D.N.Y. 1991) ("[T]he rental of property to a corporation under

6  common control with the property owner . . . is sufficient to make the rental a trade or business.").

7  The Fund has not brought to the Court's attention a single case, from this circuit or any other, in

8  which leasing activities as limited as the Van Tuyls' were found to constitute a trade or business

9  under section 1301(b)(1) where there was no economic relationship between the leased property

10 and the withdrawing employer, and the Court has found none.

11        This is not to say that there must be an economic nexus for a given activity to provide the

12 basis for controlled group liability.  The plain language of the statute indicates that an economic

13 nexus is not required, and courts have rejected the proposition that one is.  *See Lafrenz*, 837 F.2d

14 at 895 ("[S]ection 1301(b)(1) does not require that commonly controlled businesses be

15 economically related."); *Fulkerson*, 238 F.3d at 895 n.1 ("[N]o economic nexus is required

16 between the obligated organization and trades or business under common control because [section

17 1301(b)(1)] does not impose one."); *Connors v. Incoal, Inc.*, 995 F.2d 245, 249-50 (D.C. Cir.

18 1993) ("It is altogether irrelevant, under section 1301(b)(1), whether [the defendant] has an

19 'economic nexus' with [the withdrawing employer]").  But where there is no economic nexus

20 between the withdrawing employer and the alleged trade or business, leasing activities as limited

21 as the Van Tuyls' do not constitute a trade or business as defined by 1301(b)(1).  This distinction

22 between activities that are financially intertwined with the withdrawing employer and those that

23 are not makes sense in light of section 1301(b)(1)'s purpose of "prevent[ing] businesses from

24 shirking their ERISA obligations by fractionalizing operations into many separate entities." *Allyn*,

25 832 F.2d at 507.  Where an economic connection exists, that concern is heightened.  *See Messina*

26 *Products*, 706 F.3d at 882 ("[W]here the real estate is rented to or used by the withdrawing

27 employer and there is common ownership, . . . the likelihood that a true purpose and effect of the

28 'lease' is to split up the withdrawing employer's assets is self-evident.").  On the other hand, where

the leased property and the withdrawing employer are not economically connected, the threat of fractionalization is not nearly as acute.

Because the Van Tuyls have plausibly demonstrated that their leasing activities do not constitute a trade or business within the meaning of section 1301(b)(1), and the Fund has failed to present material evidence to the contrary, the Fund may not assess controlled group liability against the Van Tuyls, and the Van Tuyls are entitled to summary judgment.

## IV.  DAMAGES AGAINST TES

TES concedes liability.  *See* Van Tuyls' Mot. 6; Fund's Reply 3.  Accordingly, the Fund is entitled to damages against TES under 29 U.S.C. § 1451(b), which provides that "in any action under this section to compel an employer to pay withdrawal liability, any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution."  29 U.S.C. § 1451(b).  The statute concerning delinquent contributions requires the award of the following damages: (i) unpaid contributions; (ii) interest on the unpaid contributions as provided for under the plan; (iii) an amount equal to the greater of interest on the unpaid contributions or liquidated damages as provided for under the plan; and (iv) reasonable attorney fees and costs.  *See* 29 U.S.C. § 1132(g)(2).  "Under ERISA, the award of attorney fees to a pension plan is mandatory in all actions to collect delinquent contributions . . . , including actions to collect unpaid employer withdrawal liabilities."  *Trs. of Amalgamated Ins. Fund v. Geltman Indus., Inc.*, 784 F.2d 926, 932 (9th Cir. 1986).

The Fund seeks damages in the following amounts:  (i) $170,495.00 in unpaid contributions; (ii) $51,287.58 in accrued interest on the unpaid contributions, plus an additional $46.71 per day in interest from September 3, 2014 through the date of judgment; (iii) because the liquidated damages provided by the Fund's agreement with TES are less than $51,287.58, an amount equal to the accrued interest plus any additional interest accrued after September 3, 2014; and (iv) $34,340.69 in reasonable attorney's fees and costs incurred through July 7, 2014, plus additional fees and costs incurred after that date.  Fund's Mot. 16-18.  TES did not dispute these amounts either in its papers or during oral argument.

The Fund may recover these damages from TES.  Following entry of this judgment, the

United States District Court
Northern District of California

Fund may also file a motion for attorney's fees pursuant to Civil Local Rule 54-5 seeking fees and costs incurred after July 7, 2014.

**CONCLUSION**

For the foregoing reasons, summary judgment is GRANTED for the Van Tuyls and DENIED for the Fund as against the Van Tuyls.  Summary judgment is GRANTED for the Fund as against TES.

**IT IS SO ORDERED**.

Dated:  November 7, 2014



WILLIAM H. ORRICK
United States District Judge